**NEW YORK STATE ENERGY RESEARCH AND DEVELOPMENT AUTHORITY, Plaintiff,**

v.

**No. CIV–82–426E.**

United States District Court,
W.D. New York.

Aug. 15, 1986.

---

Philip Gitlen, Whiteman, Osterman & Hanna, Albany, N.Y., Thomas W. Evans, Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, Robert Cantor, Mudge, Rose, Guthrie, Alexander & Ferdon, Washington, D.C., Howard Jack, Act. Gen. Counsel, Deborah A. Mann, Asst., Albany, N.Y., E. Dennis Muchnicki, Karen A. Kolmacic, Asst. Attys. Gen., Columbus, Ohio, for plaintiff.

Alan C. Brown and C. Kipps, Miller & Chevalier, Washington, D.C., Richard E. Moot, Moot & Sprague, F. James Kane, Damon & Morey, William Shapiro, Jaeckle, Fleischmann & Mugel, Buffalo, N.Y., Jack McKay, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., Martin Siegel, Bishop, Liberman & Cook, New York City, Allen Beroza, Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N.Y., for defendants.

### MEMORANDUM and ORDER

ELFVIN, District Judge.

This decision marks a near-conclusion, at least at the trial level, to long-standing and often arduous efforts by the New York State Energy Research and Development Authority ("NYSERDA") to establish and enforce its rights pertaining to the storage of nuclear fuel wastes by five public utility companies—General Public Utilities Service Corporation and Jersey Central Power and Light Company (sometimes hereafter collectively referred to as "the GPU defendants"), their parent, General Public Utilities Corporation, Commonwealth Edison Company ("Commonwealth"), and Wisconsin Electric Power Company ("WEPCO")—at the nuclear fuels disposal and reprocessing center at West Valley, N.Y. ("the Center"), owned by NYSERDA. In *N.Y. St. Energy R & D. Auth. v. Nuclear Fuel Serv.*, 561 F.Supp. 954 (W.D.N.Y.1983), this Court decided *inter alia* that NYSERDA could recover for the utility defendants' unjust enrichment which arose from storage of their spent nuclear fuel at the Center for the period beginning February 25, 1982. A non-jury trial on the issue of quantum meruit damages was held before this Court June 17–21 and August 14–16 and 19–21, 1985.[1] Thereafter the parties submitted proposed findings of fact and conclusions of law together with supporting memorandums of law; oral argument was had June 4, 1986. Having reviewed the testimony and considered the credibility of the various witnesses in this case as well as the documentary evidence presented by the parties, this Court finds the pertinent facts as follows.[2]

NYSERDA is a public benefit corporation organized and created pursuant to section 1852 of New York's Public Authorities Law. NYSERDA is the successor to the New York State Atomic Research and Development Authority ("ARDA") and the New York State Atomic and Space Development Authority ("ASDA"). NYSERDA maintains its principal place of business in Albany, N.Y. The utility defendants are organized under the laws of and have their principal places of business in states other than New York. The case is before this Court pursuant to diversity jurisdiction.

---

1. Trespass as an issue in the case was eliminated by this Court's November 7, 1985 letter to the attorneys. Questions regarding costs of removal of the defendants' spent fuel and the timing of such were resolved by stipulations filed June 20, 1985 and February 2, 1986.

2. This Court has relied heavily for undisputed or relatively little disputed facts on the proposed findings and conclusions of the parties. The preparation and compilation by the attorneys of the complex and sometimes arid data and their marshalling of difficult arguments has been of the high caliber of legal work generally associated with this litigation and are commended. Additionally many facts have been admitted or stipulated. *See* Plaintiff's Exhibit 30 ("P30") and Defendants' Exhibit 48 ("D48").

The Center has been held by NYSERDA in the name of the people of New York since March 21, 1963 when it was acquired for approximately $500,000. It occupies some 3,345 acres, roughly thirty miles south of Buffalo in Cattaraugus County. In 1963 defendant Nuclear Fuel Services, Inc. ("NFS") and ARDA entered into three contracts concerning the Center. These contracts, collectively known as the West Valley Agreements, consisted of a Lease (P1), a Waste Storage Agreement (P3) and a Facilities Contract (P2), each dated May 15, 1963. The agreements generally authorized NFS to construct, operate and manage a commercial spent nuclear fuel facility and related facilities at the Center.

Pursuant to the Facilities Contract NFS constructed, among other facilities, a Fuel Receiving and Storage Facility ("FRF") containing a spent fuel storage pool at which spent fuel was received and temporarily stored pending reprocessing. The items constructed, their components and each item's allocated portion of the overall cash payment by ARDA to NFS pursuant to the Facilities Contract, as agreed upon between NFS and ARDA prior to construction, are set forth in Exhibits A and B to the Facilities Contract. Title to each of these facilities is, and has at all times been, vested in ARDA, ASDA and NYSERDA.

The Lease provided for the letting to NFS of the Center and the facilities constructed for ARDA under the Facilities Contract. The Lease further provided that NFS would construct a spent nuclear fuel reprocessing plant ("the Plant") and related facilities and authorized NFS to conduct nuclear fuel reprocessing at the Center. Upon expiration or other termination of the Lease, title to the Plant and related facilities constructed by NFS (other than those facilities constructed under the Facilities Contract) was to vest in NYSERDA. The Waste Storage Agreement generally provided the terms and condition governing NFS's operation, maintenance and responsibility for certain radioactive waste and facilities used for the storage of such

waste. From 1966 to 1971 spent nuclear fuel containing approximately 625 metric tons [3] of uranium ("MTUs") was reprocessed by NFS at the Center. In 1972 NFS discontinued reprocessing to accommodate a planned enlargement and modification of the Plant and other facilities. NFS never resumed reprocessing of spent nuclear fuel at the Center. *See, N.Y. St. Energy R. & D. Author. v. Nuclear Fuel Serv., supra,* at 961.

Two actions relating to the West Valley Agreements (*New York State Energy Research and Development Authority v. Nuclear Fuel Services, Inc.,* CIV–81–18E, and *Nuclear Fuel Services Inc. v. New York State Energy Research and Development Authority,* CIV–81–683E) were ultimately resolved by a Settlement Agreement, Stipulation and Order approved by this Court February 19, 1982. Pursuant to the Settlement Agreement, the Lease was deemed to have expired according to its terms December 31, 1980, NFS agreed to make payments to NYSERDA totaling $9.4 million, the actions were suspended and later dismissed and the parties exchanged certain releases. NFS also agreed to pay NYSERDA certain charges for the storage of spent nuclear fuel owned by NFS and then in storage in the FRF and to remove such spent nuclear fuel and other materials from the Center.

The West Valley Demonstration Project Act ("the Act"), Pub.L. 96–368, enacted October 1, 1980, directs the United States Department of Energy ("the DOE") to carry out a radioactive waste management demonstration project ("the Project") at the Center. The Act also directs the DOE to enter into a Cooperative Agreement with New York under which New York will make available to the DOE the facilities at the Center and the high-level liquid radioactive waste to be solidified and which will provide for New York to pay 10% of the cost of the Project as determined by the DOE.

---

**3.** A "metric ton" is 1,000 kilograms or 2,200 pounds.

As has previously been noted by this Court, *N.Y. St. Energy R. & D. Auth. v. Nuclear Fuel Serv., supra* at 964, the DOE and NYSERDA, pursuant to the Act, entered into a Cooperative Agreement October 1, 1980, delineating the rights and responsibilities of the parties with respect to the Project and the Center. Section 4.11 of the Cooperative Agreement provides that the DOE will,

"in connection with its responsibility for operation and maintenance of the Fuel Storage and Receiving Area at the Center for use in the Project, be responsible as agent of NYSERDA for the management, maintenance and surveillance of the irradiated nuclear fuel elements now stored therein * * *." [4]

The "incremental cost" of such services by the DOE is, under section 4.11 of the Cooperative Agreement, the financial responsibility of NYSERDA.

Pursuant to the statute, NYSERDA agreed to pay 10% of the costs of the Project ("the Project Costs"). NYSERDA's share of the Project Costs can be paid in one of three ways. First, NYSERDA can pay all or a portion of its annual share by expending funds for the provision of services ("Authority Services") which it and the DOE agree support the Project. Second, NYSERDA can pay for its share of the annual Project Costs by expending a portion of a negotiated credit for the value of the use of the Center for carrying out the Project. Finally, NYSERDA can pay any remaining balance of its share directly to the DOE. Also pursuant to the Cooperative Agreement, NYSERDA receives certain credits against its 10% costs obligation. These credits include: (1) $12 million for making the Center available to the DOE for the Project; and (2) up to $900,000 annually (in 1980 dollars adjusted for inflation) for services provided to the DOE in connection with the Project.

On February 25, 1982 the DOE assumed exclusive use and possession of a portion of the Center and related facilities,[5] including the FRF, for use in carrying out the Project. West Valley Nuclear Services, Inc. ("WVNS") operates and maintains those premises and facilities and implements the Project pursuant to a contract with, and subject to the discretion of, the DOE. Pursuant to the Cooperative Agreement, the DOE's possession of and responsibility for all of the premises and facilities at the Center will conclude when the Project is completed. In order to carry out the Project, the DOE's plans required that the spent fuel be removed from the FRF.

As of February 25, 1982 there were 163.5 MTUs of spent nuclear fuel located in the FRF. The capacity of the pool was 250 MTUs. Of this spent nuclear fuel, approximately 20.4 MTUs were owned by Commonwealth, 43 MTUs by WEPCO, 42.8 MTUs by the GPU defendants. The defendants originally had shipped their spent fuel to the Center pursuant to agreements that NFS would provide reprocessing services. Additionally, NFS and a non-party utility had 166 spent fuel assemblies containing 42.2 MTUs in storage at the FRF at times pertinent to this action. The process leading up to and including the defendants' acknowledgment of responsibility for their spent fuel and attempts between the parties to negotiate long-term storage agreements, is set forth in *N.Y. St. Energy R. & D. Auth. v. Nuclear Fuel Serv., supra* at 962–964. Such negotiations were unavailing. In a Memorandum and Order filed June 30, 1983 this Court declared the utility defendants to be under a duty to remove their spent fuel from NYSERDA's property "as expeditiously as reasonably possible," failing which, implicitly, they would be held liable as trespassers. There is no disagreement as to the nature and sequence of the defendants' efforts promptly to remove the spent fuel, and most of the fuel had been removed by the time of trial. *See* Plaintiff's Proposed Findings of Fact ¶¶ 24, 27, 30; Defendants' Proposed Find-

---

**4.** The DOE is responsible, as NYSERDA's agent, for the management, maintenance and surveillance of the spent fuel at issue in this case.

**5.** Described in Exhibits B and C to the Cooperative Agreement.

ings of Fact ¶¶ 27, 28, 30, 32, 33. Additionally, some spent fuel belonging to NFS and a non-party utility was in storage at the Center at the time of trial by agreement with NYSERDA.

The GPU defendants have made payments to NYSERDA totaling $403,200 for spent fuel storage at the Center (reflecting the rate at which they had been paying NFS for storage). These payments shall be credited against NYSERDA's recovery. (For the quarterly itemization of such payments, see Plaintiff's Proposed Findings of Fact ¶ 33 and Defendants' Proposed Findings of Fact ¶ 42). Neither Commonwealth nor WEPCO has made payments to NYSERDA for storage of this fuel.

The remaining factual determinations are, properly speaking, mixed questions of fact and law. Accordingly some consideration of the legal framework is appropriate. In *N.Y. St. Energy R. & D. Auth. v. Nuclear Fuel Serv., supra* at 982–983, this Court wrote concerning the spent fuel storage:

> "The utility defendants have received a substantial benefit from NYSERDA * *, a benefit for which, had NYSERDA not been in essentially a defenseless position, these defendants would have had to bargain. Equity and good conscience require that the utility defendants pay NYSERDA for this benefit, at a rate to be determined upon competent evidence of the value to such defendants of the storage during the period for which it is ultimately determined that they are liable therefor to NYSERDA, but at least since the DOE takeover on February 25, 1982.
>
> ' "The obligation implied under such circumstances * * * is such as justice would dictate, and must conform to what the court may assume would have been the agreement of the parties if the situation had been anticipated and provided for." ' *Bradkin v. Leverton,* 26 N.Y.2d 192, 196–197, 309 N.Y.S.2d 192, 195–196, 257 N.E.2d 643, 645 (1970).
>
> *See, also, Evans v. City of Johnstown,* 96 Misc.2d 755, 410 N.Y.S.2d 199, 204 (Sup.Ct., Fulton Co. 1978); *Rand Products Co., Inc. v. Mintz,* [72 Misc.2d 621, 340 N.Y.S.2d 444, 445 (Sup.Ct., App. Term, 1st Dept. 1973) ], *aff'g* 69 Misc.2d 1055, 332 N.Y.S.2d, 452 at 456; *Restatement of the Law of Restitution,* § 155."

This initial framework of recovery was reiterated by this Court in its Memorandum and Order filed April 25, 1983. There, too, this Court noted:

> "It has become practically the premise in this litigation that as a matter of fact there presently exists no market in this country for the storage of high-level radioactive wastes from nuclear power generating facilities * * *. Those facilities that did formerly accept the deposit of such wastes * * * did so in connection with agreements to reprocess such wastes * * *. Agreements that were made under these conditions have no conceivable relevance to the value to utility companies of storage without expectation of reprocessing, the situation at West Valley during all times herein pertinent." *Id.* at 7–8.

The lack of a market makes speculative the gauging of competition *vel non* and the effect such would have had on pricing. This Court had stated tentatively (and does so. now conclusively) that NYSERDA should not have the advantage of a maximization of prices due to lack of competition which would inhere in a monopolistic market position, and had concluded:

> "In view of the many decisions suggesting that the proper measure of damages is the market cost of the services received * * * and in view of the absence of any true market in this case, I think that recovery should be based upon the reasonable costs to plaintiff [6] of render-

**6.** "Costs to plaintiff" were defined as "overhead costs in general, including normal considerations pertaining to the cost of constructing the storage facility. Although the direct cost of construction was apparently borne by Nuclear Fuel Services, Inc., it was agreed from the beginning that the storage facility was to become plaintiff's property upon termination of Nuclear Fuel Services, Inc.'s lease of the premises, so it may be assumed that sufficient

ing the services received by defendants, plus a margin of profit comparable to that obtaining in similar or related industries during the relevant period." *Id.* at 10–11.

Subsequent arguments by the parties have cast a Delphian murkiness on these pronouncements. However it is apparent that the great disparity in the parties' positions is due more to the push and pull of self-interest than to the difficulty of understanding the equitable principles involved. The tendency to string-cite cases involving ambiguous and generalized application of equity does not really add anything of value to this Court's initial analysis and may simply confuse the issues. An unavoidable premise is that, due to the nature of this case and its unusual array of circumstances, any award (and indeed most determinations leading to such) will have a large degree of arbitrariness. There simply is no "right" answer although it is hoped there is a "fair" one. This Court's decisions on damages mention, variously, a recovery based on: (1) the value to the defendants; (2) an agreement which the parties would have reached if they had anticipated the situation; and (3) the plaintiff's costs plus a margin of profit. These considerations in some sense might be said to be mutually exclusive (and the parties have played on that fact, understandably, as it has suited their respective arguments). Moreover, viewed in isolation they are incongruous: the very thought of an agreement of the parties had they anticipated the situation does not hold up well to serious analysis. On the one hand is the fact that the parties did not agree once they were aware of the situation. More to the point are questions such as: Agreed to what? Anticipated what? If they had anticipated the situation wouldn't it have been simpler and more desirable to all concerned to remove the fuel *ab initio?* The difficulty is that the lack of a valid basis for comparison can be

used to falsify at the outset these traditional equitable approaches. What this Court has attempted to do is to amalgamate these approaches into an overall equitable structure. What it has done is to stay as close as possible to "real" and identifiable costs in this case. In effect, the defendants will be required to pay a reasonable storage fee for services at the Center as it physically existed. This clearly involves some inefficiency of operation (the Center not being designed for the storage business) but also certain cost benefits to the defendants. The defendants moreover will be expected to pay a full price for such services. Thus, where appropriate, damages will be calculated as if NYSERDA was the only entity involved in the operation. The various financing arrangements at the Center—fortuitous for present purposes—necessarily create a windfall for one party. The equities dictate that NYSERDA should be the beneficiary. At the same time, a logical extension of this approach presupposes that NYSERDA should not gain a windfall from its tax-exempt status, an issue which shall be further analyzed. The defendants have misconstrued the concept of unjust enrichment applied by this Court. As they point out, it has been stated:

> "To recover on a theory of unjust enrichment a plaintiff must prove that the defendant was enriched, that such enrichment was at plaintiff's expense, and that the circumstances were such that in equity and good conscience the defendant should return the money or property to the plaintiff." *Dolmetta v. Uintah Nat. Corp.,* 712 F.2d 15, 20 (2d Cir.1983).

That the enrichment was at a plaintiff's expense, however, does not require that every element of an appropriate recovery—in a complex and unusual case such as this one—match up with the actual expenditures by a plaintiff (where such can be identified) as the defendants argue. *See* Defendants' Joint Response To Plaintiff's

consideration was given for such construction. No reason suggests itself why the utility defendants ought to receive a waste storage windfall due to the mere fortuity that the owner of the West Valley facility did not also

construct it. * * * Plaintiff's proper costs may be and should be determined by expert analysis, based upon accepted business principles, of data pertinent to the West Valley operation alone." *Id.* at pp. 10–11, fn. 3.

Post-Trial Submissions at 47. It is the overall recovery that is sought to be equitable, and the components of such may be (and are) subject to various interlocking variables.

Some of the more extreme positions taken by the parties are clearly without merit (which is not to imply that this case lends itself to a "splitting the difference" style remedy). Examples of such positions are, on the one hand, the plaintiff's attempt to establish a generic and overbroad asset base and on the other, the defendants' assertion that no asset base should be considered as part of the recovery. While the defendants pay lip service to this Court's conclusion in its April 25, 1983 Memorandum and Order that they are not entitled "to receive a waste storage windfall due to the mere fortuity that the owner of the West Valley facility did not also construct it," *id.* at p. 11, fn. 3, they miss the point of that conclusion. It is irrelevant in this context whether NFS or NYSERDA paid for the FRF, or whether NYSERDA, having paid, was reimbursed. So too, the defendants' secondary argument—that NYSERDA's investment in the Center is a sunk cost in a defunct facility, *see* Defendants' Memorandum dated April 14, 1986 at p. 21—while it may be sound economic theory in a general sense, has no application here.

The parties agree the appropriate fee can be calculated by determining an annualized revenue requirement and dividing that by the appropriate FRF utilization level. This calculation results in a dollars per kilogram of uranium ("KgU") per year storage charge. The annualized revenue requirement must take into account the asset base, operating costs, anticipated costs of decontamination and decommissioning, and a reasonable rate of return. The parties, of course, disagree as to the relevant components.[7]

The most appropriate asset base is the alternative proposal of the defendants' expert witness Edway R. Johnson[8] set forth in D2A at 3–1 to 3–3, which analyzes investments in the FRF and related service facilities, whether made by NYSERDA or NFS. Johnson's alternative model excluding investments by NFS must be rejected for reasons earlier explained. The plaintiff, for comparative purposes, proposes three measures of an asset base but concludes that the "FRF Plus Service Facilities" model is most appropriate. This model, as is Johnson's, is based on the Bechtel Capitalization Report (P18), a breakdown of cost at the Center prepared for NFS. The plaintiff, however, includes in the asset base "the entirety of any system used at the Center," Plaintiff's Post-Trial Memorandum at p. 72, whereas Johnson allocates facilities in the Bechtel Report which were used in common between fuel storage and reprocessing in order to reflect more precisely the costs in fact attributable to storage. The plaintiff acknowledges the generality of its approach, but argues, somewhat lamely, that it "best reflects the reality that common systems at the Center supported both the fuel storage and reprocessing functions." *Ibid.* This Court, however, is persuaded that Johnson's conclusions are the most reasonable under the necessarily imprecise circumstances of the case and that he is sufficiently qualified to

7. Also, much has been made by the defendants of the so-called derivation of this structure by their expert witness, John F. Utley (whose qualifications are listed in the Defendants' Proposed Findings of Fact ¶¶ 53–60), based on utility ratemaking practices. While this Court does not share the plaintiff's concern that such comparisons are irrelevant—*Ripley v. International Railways of Cent. America*, 8 A.D.2d 310, 188 N.Y.S.2d 62 (1st Dept.1959), *aff'd*, 8 N.Y.2d 430, 209 N.Y.S.2d 289 [171 N.E.2d 443] (1960), cited by the plaintiff for the proposition that ratemaking is irrelevant to recovery based on unjust enrichment where the value of the service received is the measure of recovery, in fact merely concludes that there was no constraint to apply strict ratemaking practices but rather an entitlement to weigh all relevant considerations (an equitable principle which has been this Court's lodestar in the case at bar)—, it is not overwhelmed by the probative value of such.

8. Johnson is president of E.R. Johnson Associates. His background and qualifications are set forth in the defendants' Proposed Findings of Fact ¶¶ 61–77.

make the judgments involved. Johnson utilized costs of construction and improvement stipulated to by the parties and allocated such costs based upon the intended usage of the various facilities at the time of their installation at the Center. This allocation recognizes the relatively incidental role of storage facilities at the Center.[9] Based on Johnson's calculations, the gross asset base for purposes of NYSERDA's recovery herein is deemed to be $4,362,000, and the net (depreciated) asset base to be $2,178,000 (an annual depreciation of $128,000).[10]

The plaintiff contends that operating costs totalling $1,500,000 per year should be recovered. This figure reflects a so-called "stand-alone" fuel storage facility model developed by the plaintiff's expert witness John H. Ellis[11] based on "cost estimates relative to several different fuel storage facilities." Plaintiff's Proposed Findings of Fact ¶ 61.

> "The stand-alone model assumes the existence of each of the systems, facilities and services necessary to the operation and maintenance of a fuel storage facility but excludes consideration of a related or associated facility with which certain costs could be shared." *Ibid.*

Such model must be rejected. As the defendants contend, it has little pertinency to the circumstances in this case inasmuch as the FRF was not a stand-alone facility. The arbitrariness of the result and its gross overproportion was further demonstrated, in this Court's view, by Ellis's testimony about calculations he made during the trial about operating costs for a storage facility with an adjacent nuclear facility.[12] This Court's purpose throughout has been to keep in view whatever factual on-site data is available—something the plaintiff here has completely failed to do. At the same time, this Court is not convinced by the defendants' attempt to limit operating costs to $141,000. The plaintiff's expert witness Donald A. Curtis,[13] has asserted that sufficient documentation is not available to determine accurately the actual costs incurred in the operation of the FRF. However, this Court concludes that an analysis of this material provides a better approach to the matter than does the plaintiff's proposed hypothetical model, or the defendants' limited "out of pocket" costs approach.[14]

Curtis identified three categories of cost. The first—direct non-project expenses for maintenance and security of the FRF incurred by NYSERDA pursuant to Section 4.11 of the Cooperative Agreement (*see* Plaintiff's Proposed Findings of Fact ¶ 69) —in the amount of $384,000 for the relevant three-year period (April 1, 1982 to March 31, 1985) is not disputed by the defendants. *See* Defendants' Joint Response to Plaintiff's Post-Trial Submissions p. 79 ¶ 15. Similarly, the defendants do not contest the inclusion of a $39,000 charge for equipment operating costs associated with the operation of the FRF resin solidifi-

---

9. Johnson's "allocation factors" are detailed in the Defendants' Proposed Findings of Fact ¶ 144. This Court also accepts Johnson's conclusion as to which items should be excluded because they were installed primarily to serve reprocessing and did not substantially contribute to the operation of the FRF. *See id.* at ¶ 145.

10. Such is based on the parties' agreement to apply a 33–year useful life to gross asset values to determine an appropriate annual depreciation element and the depreciated asset base for calculation of the annual return.

11. Ellis's background is set forth in the Plaintiff's Proposed Findings of Fact ¶ 49.

12. The Plaintiff's Proposed Findings of Fact ¶ 67 asserts such "configuration is in some respects more analogous to the FRF at the Center." It is not explained in what way, if any, such would be *less* analogous. There is no clearly expressed basis for choosing between the two projections.

13. Curtis's background is set forth in the Plaintiff's Proposed Findings of Fact ¶ 47.

14. The choice is a reluctant one. Curtis's testimony on cross-examination revealed a lack of energy pursuing this line of investigation. Nevertheless this Court is convinced that this is the best of the approximations presented by the parties.

cation system. *Ibid.*[15] Curtis also allocated $225,000 for the value of FRF generated low-level waste disposal. It is conceded that NYSERDA did not pay directly any costs of such disposal. The defendants do not argue that there is no theoretical incremental value to such service or that it would not be a necessary incident to fuel storage. Instead they argue there was no "cost" to NYSERDA and no increase in long-term liability because the amount of waste is relatively small and the burial area was already contaminated. The defendants' argument is comparable to that made in an attempt to reduce the allocable amount base and is rejected for similar reasons. Clearly this is an anticipated real cost of the storage operation. The only question is its measurement. Daniel B. Anderson, a NYSERDA engineer, estimated an annual cost of $75,000 based on his experience and on comparisons to the Chem-Nuclear facility in Barnwell, S.C. The validity of Anderson's calculations was confirmed by Ellis. Although this Court has had throughout a disinclination for the "bludgeon-like" quality of comparative estimates in this case, it is convinced that the cost is an appropriate one and is reasonably reflected by the $75,000/year amount.

The second category of costs identified by Curtis, at an estimated annual rate of $155,000 is "costs incurred by NYSERDA in connection with the storage of spent nuclear fuel that were credited towards its allocable share of Project Costs under Section 5 of the Cooperative Agreement as an 'Authority Service.'" Plaintiff's Proposed Findings of Fact ¶ 70. The final category of costs, estimated at $73,000 annually, is described as "expenses necessary to enable the operation of the facility incurred by DOE as Project Costs which directly benefited the FRF users." *Id.* at ¶ 71. In both cases the defendants assert, again, that these were not NYSERDA's costs. As previously stated that fact, if fact it is, does not change the reality that identifiable services having an identifiable value (at least roughly) were rendered. It is concluded that plaintiff's recovery shall include an allocated portion of operating costs totalling $444,000 annually.

The parties agree that a fund between $5,484,000 and $7,152,000 is necessary to provide for decontamination and decommissioning of the FRF at the end of its useful life. The defendants seek to allocate $6 million to the fund based on Johnson's analysis and testimony. However, Johnson did not really articulate a reason for this choice other than that it fell within the range agreed to by the parties. This range is set forth and analyzed in the May 1984 West Valley Spent Fuel Storage Report prepared for NYSERDA by Ellis and Karl J. Bambas.[16] (P16.) The fluctuation in cost depends on whether the waste is classified as non-transuranic (having a low plutonium content and lower disposal costs) or transuranic (higher plutonium level, higher cost). Ellis testified credibly that the $7,152,000[17] cost factor is appropriate. He concludes that the FRF waste is likely to be classified as transuranic because failed or ruptured fuel elements were present in the pool, and because the cost of measuring the plutonium content of the waste probably would moot any savings from a lower level classification. The plaintiff has calculated, and this Court adopts, an annual cost for decontamination and decommissioning of $106,000 by converting the $7.1 million from 1983 dollars to 1999 dollars—the projected decontamination and decommissioning date—and amortizing the result over the facility's useful life. Plaintiff's Proposed Findings of Fact ¶ 86.[18]

**15.** The defendants contend that the measure of the operating costs should be limited to these two charges—an annual rate of $141,000.

**16.** Bambas was the plaintiff's third expert witness. His qualifications are summarized in the Plaintiff's Proposed Findings of Fact ¶ 48.

**17.** The plaintiff has rounded off this figure to $7,100,000.

**18.** The argument that only 10% of this sum should be included in the recovery calculation because NYSERDA is only liable for such proportion of such costs pursuant to the Cooperative Agreement is consistently advanced by the

Both parties agree that NYSERDA's profit must be determined as an appropriate rate of return on the net value of the assets used to provide the storage service. The plaintiff addressed testimony generally setting that rate at 20 to 30 percent and opts for the higher figure based on the "risks" inherent in nuclear fuel storage. Plaintiff's Proposed Findings of Fact ¶¶ 106–109. The defendants do not challenge this range but argue that NYSERDA's tax exempt status should be factored into the equation. Notwithstanding the plaintiff's strong opposition, this Court is convinced that such is the case. For equitable purposes, as previously stated, costs have been gauged at the facility by and large as if NYSERDA had incurred them. The attempt is to create a bargained-for, "market-like" price based on the value of the services. Profit, however, is intrinsic to NYSERDA as the seller. It is frivolous to argue that a price a seller charges will not in most cases be affected by the seller's cost. Thus cost saving exists and would have existed whether or not NYSERDA had shouldered all of the facility expenses and thus does not have the same element of fortuity which underlay the Court's decision not to grant the defendants a windfall. It is concluded that the 12% rate of return proposed by the defendants (taking into account NYSERDA's tax exempt status) is appropriate. *See* Defendants' Proposed Findings of Fact ¶¶ 183–197.

Consistent with the foregoing, the annual revenue requirement is $939,360.

There remains to be determined an appropriate pool utilization factor from which a unit fee can be calculated. The arguments on this issue highlight the difficulty that has prevailed throughout this attempt to establish reasonable damages. The plaintiff has produced credible testimony that the average utilization of the 250-MTU capacity storage pool during the rele-

vant time period was 116.8 MTUs. The defendants argue such rate which measures declining usage is only appropriate if all aspects of the recovery are gauged from the perspective that NYSERDA was going out of the fuel storage business. In an actual business, as the defendants argue, an operating level would undoubtedly be targeted and would be a major factor in any pricing consideration. The defendants seek to set this level at 200 MTUs or eighty percent of capacity, which they assert is a reasonable commercial usage standard.[19] Without question, this Court has approached damages on the premise that NYSERDA operated a fuel storage business or a "near-business." At the same time it has attempted, where possible, to avoid hypothetical and speculative economic models—preferring to tailor the recovery to "real" and identifiable factors. The plaintiff's and the defendants' proposals—both of which are persuasive in some respects—seem inconsistent with that approach. The defendants, however, have suggested as an alternative that a utilization rate of 163.5 MTUs—the actual pool usage in 1982—be adopted. This rate, which comes near to splitting the difference between the two positions, appears the most appropriate choice. Factoring such into the damages equation, it is concluded that NYSERDA is entitled to a recovery at a rate of $5.74532/KgU/yr.

The plaintiff seeks and the defendants oppose an award of pre-judgment interest. The plaintiff seeks interest at the average rate of short-term interest paid by two of the three defendant utilities during the relevant time period—*i.e.*, 10.72%—but has not established the interest paid by the third defendant. The defendants do not dispute that, in an equitable action such as this, whether to award pre-judgment interest, how much to award, and the date from which such should be computed, lie within this Court's discretion. Section 5001 of

defendants and is by this Court consistently rejected.

**19.** As the plaintiff points out, the defendants' resort to a hypothetical analysis at this juncture

is somewhat inconsistent with their attacks on the plaintiff's attempts to do the same at earlier stages of the litigation.

New York's Civil Practice Law and Rules ("CPLR"). Rather they assert that no interest should be awarded, or that it should be awarded commencing April 25, 1983 (when NYSERDA made its unequivocal demand for removal of their fuel), or that such ought to begin on the first date on which the DOE could have loaded the fuel (presumably early 1982—no date is specified), and that the interest rate should be set at NYSERDA's cost of borrowing— 6.125%—and in any event no higher than the 9% statutory rate. CPLR ¶ 5001(b) provides that interest "shall be computed from the earliest ascertainable date the cause of action existed * * * "—in this case, February 25, 1982. Because this Court is not persuaded by the proposed rates of any of the parties, interest is awarded at the statutory rate. CPLR § 5004.

Accordingly, the plaintiff is directed to prepare a decree in conformance with this Memorandum and Order and to submit it, together with appropriate calculations for the entry of final judgment within sixty (60) days of the entry of this Memorandum and Order.